UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JENNA-ROSE B.,

Plaintiff,

- against -

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**25 Civ. 3017 (GS)**

**OPINION AND ORDER**

**GARY STEIN, United States Magistrate Judge:**

Plaintiff Jenna-Rose B. ("Jenna-Rose" or "Plaintiff") seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of a final determination of the Commissioner of Social Security (the "Commissioner") denying her claim for social security disability benefits. Plaintiff moves to vacate the administrative decision denying her claim and remand for additional proceedings. (Dkt. No. 11). For the reasons set forth below, Plaintiff's motion is **DENIED** and the Commissioner's decision is **AFFIRMED**.

## BACKGROUND

### A. Procedural History

On May 13, 2021, Jenna-Rose applied for Supplemental Security Income ("SSI") benefits under the Social Security Act, alleging a disability onset date of January 21, 2021. (Dkt. No. 8, Administrative Record ("AR") 206–12). The Social Security Administration ("SSA") initially denied Jenna-Rose's application on July 22, 2021, and again after reconsideration on April 26, 2022. (AR 115–17, 126–28).

Jenna-Rose requested a hearing before an Administrative Law Judge ("ALJ") on June 24, 2022. (AR 138).

A hearing was conducted before ALJ Kieran McCormack on November 14, 2022. (AR 34–73). In a decision issued on November 22, 2022, the ALJ found that Jenna-Rose was not disabled within the meaning of the Social Security Act and denied her application for benefits. (AR 15–25). On November 7, 2023, the Appeals Council denied Jenna-Rose's request for review of the ALJ decision (AR 1–6), prompting her to file a suit in this district thereafter (No. 23 Civ. 11293 (RFT)). Upon stipulation, the Clerk of Court remanded the action back to the ALJ for further administrative proceedings on May 4, 2024. (AR 622–24). The Appeals Council then issued its order of remand on June 12, 2024. (AR 637–38).

ALJ McCormack held a second hearing on January 30, 2025. (AR 556–94). He subsequently issued a decision on May 5, 2025 (the "ALJ Decision"), finding again that Jenna-Rose was not disabled within the meaning of the Social Security Act. (AR 535–49). The Appeals Council did not assume jurisdiction, making the ALJ's second decision the Commissioner's final decision. 20 C.F.R. § 416.1484(c)–(d).

Jenna-Rose filed her Complaint seeking review of the ALJ Decision on April 11, 2025. (Dkt. No. 1). Jenna-Rose moved for judgment on the pleadings on September 15, 2025. (Dkt. No. 11 ("Pl. Br.")). The Commissioner filed a brief on January 27, 2026. (Dkt. No. 13 ("Gov. Br."). Jenna-Rose filed a reply brief on February 10, 2026. (Dkt. No. 14 ("Reply")).

**B. Administrative Record**

Jenna-Rose was 19 at the time she applied for SSI benefits in 2021, alleging disability based on fibromyalgia. (AR 233, 236). She has a high school education, and had worked as a barista, cashier, doctor's office clerk, and customer service representative. (AR 237–38). She continued working part-time after applying for SSI benefits, as a canine coach at a dog day care facility from July 2022 to February 2024 and at Target from April to May 2024. (AR 564, 565, 745).

**1. Dr. Hom's Assessments**

At all relevant times, Jenna-Rose received treatment for her fibromyalgia from Dr. Christine Hom at Boston Children's Health Physicians, New York and Connecticut. (*See* AR 757–64 (medical source statement)).

Jenna-Rose was first seen for a fibromyalgia examination by Dr. Hom on December 3, 2018, when she was 17. (AR 434–36). Dr. Hom noted that Jenna-Rose displayed "[m]ultiple fibromyalgia tender points and negative control points," but that her physical examination was otherwise normal overall. (AR 434–35). Dr. Hom recommended daily aerobic physical therapy, sleep hygiene, and cognitive behavioral therapy, and noted that "low dose tricyclic antidepressants may be beneficial." (AR 435).

Jenna-Rose then saw Dr. Hom on January 7, 2019 for fibromyalgia, fatigue, and back pain. (AR 437–39). Dr. Hom found that the fatigue occurred intermittently, but the symptoms had improved, and that Jenna-Rose was exercising and sleeping better. (AR 437). Dr. Hom then noted a moderate severity

level for back pain, which occurred intermittently. (AR 437). Dr. Hom explained that Jenna-Rose continues to complain of back pain, but was "functioning well" and "attending all activities." (AR 437). Dr. Hom documented a generally normal physical exam, and reiterated the patient plan established at the December 3, 2018 visit. (AR 437–38).

Jenna-Rose returned to Dr. Hom on April 1, 2019. (AR 439–40). Jenna-Rose reported her symptoms as severe and chronic. (AR 439). Aggravating factors included inactivity, and relieving factors included movement. (AR 439). Notably, Dr. Hom found it "difficult to elicit" fibromyalgia tender points, and otherwise documented generally normal physical examination. (AR 439–40). Dr. Hom noted that Jenna-Rose was following her regimen with moderate success, and that she was pleased with Jenna-Rose's progress. (AR 440). Dr. Hom ordered cognitive behavioral therapy, daily aerobic exercise, and having the same bedtime each night. (AR 440).

Jenna-Rose saw Dr. Hom again one month later on May 2, 2019. (AR 441–43). Dr. Hom explained that Jenna-Rose reported her symptoms as being severe and chronic. (AR 441). Dr. Hom noted that Jenna-Rose's function was better, and that she is in school almost every day. (AR 441). The physical examination results were normal overall. (AR 441–42).

At a September 5, 2019 visit with Dr. Hom, Jenna-Rose reported her symptoms as moderate and chronic. (AR 443). Dr. Hom documented positive fibromyalgia tender points and negative control points, a cooperative and engaged

demeanor, and an otherwise generally normal physical examination. (AR 443–44). Beyond the typical recommendations of exercise and consistent bedtime, Dr. Hom ordered certain tests to be performed. (AR 444).

Jenna-Rose's next visit with Dr. Hom took place on December 23, 2019. (AR 446–47). Jenna-Rose reported her symptoms as moderate and chronic, and Dr. Hom documented a generally normal physical examination. (AR 446–47). Dr. Hom found that the chronic fatigue issue was ongoing, with Jenna-Rose's primary complaints being "more predominantly fatigue rather than pain," and that Jenna-Rose's fibromyalgia had improved. (AR 447). Around this time, Jenna-Rose started taking vitamin D. (*See* AR 446).

In the next visit with Dr. Hom on March 16, 2020, Jenna-Rose reported severe fibromyalgia symptoms that occurred constantly and were widespread. (AR 448). Dr. Hom noted that Jenna-Rose had reduced pain and fatigue, and that her overall function was improved with fewer headaches. (AR 448). However, Jenna-Rose was not "exercising as well as she might and her sleep [was] correspondingly worse, with nonrestorative sleep." (AR 448). Dr. Hom again documented a generally normal physical examination, and stated that Jenna-Rose appeared "the best [Dr. Hom had] seen her." (AR 450). Dr. Hom found that Jenna-Rose's chronic fatigue and fibromyalgia had improved. (AR 450).

On August 31, 2020, Dr. Hom completed a medical source statement concerning Jenna-Rose's fibromyalgia. (AR 427–33). The statement noted that Jenna-Rose suffered from symptoms including multiple tender points,

nonrestorative sleep, chronic fatigue, and morning stiffness, and described her pain as "fluctuating, severe in bursts." (AR 428, 429). Dr. Hom stated that Jenna-Rose's symptoms were severe enough to interfere with her attention and concentration, but only occasionally (under one-third of an eight-hour day). (AR 430). Dr. Hom also noted that Jenna-Rose could handle moderate work stress, but would need to take unscheduled breaks during an eight-hour workday around nine times a week, lasting 10 minutes each. (AR 430–31).

Dr. Hom next saw Jenna-Rose on September 14, 2020. (AR 452–53). Dr. Hom noted a moderate-severe fatigue level, that the fatigue was stable, and was aggravated by stress, exertion/exercise, and work issues. (AR 452). Relieving factors for the fatigue included stress reduction and sleep hygiene. (AR 452). However, Dr. Hom found that both Jenna-Rose's chronic fatigue and fibromyalgia had improved. (AR 453).

Dr. Hom saw Jenna-Rose again on April 19, 2021. (AR 482–83). There, Jenna-Rose showed "[m]ultiple fibromyalgia tender points and negative control points," showed "[n]o arthritis or myositis," had good "[s]trength and flexibility," and was "[o]riented to time, place, person & situation." (AR 483). Dr. Hom also documented a generally normal physical exam. (AR 483).

Jenna-Rose saw Dr. Hom again on September 27, 2021 for "musculoskeletal pain." (AR 513–14). Dr. Hom noted that Jenna Rose's musculoskeletal pain has lasted three years, that Jenna-Rose has "[m]ultiple fibromyalgia tender points and negative control points," that her pain is at a "moderate-severe" severity level, that

she is "stable," and that her pain "occurs constantly," but that strength and flexibility were "good." (AR 513). Dr. Hom also explained that Jenna-Rose showed "[e]asy fatiguability" and "doesn't tolerate exertion." (AR 514).

During a January 24, 2022 visit with Dr. Hom, Jenna-Rose stated that her symptoms were "chronic." (AR 510). Dr. Hom wrote that Jenna-Rose "[h]as been well" and sometimes has difficulty falling asleep. (AR 510). Dr. Hom also noted that Jenna-Rose's complaints were "somewhat reduced." (AR 511).

Jenna-Rose saw Dr. Hom next on June 6, 2022. (AR 525–27). Jenna-Rose reported severe, chronic symptoms with widespread pain and difficulty sleeping. (AR 525). Dr. Hom reported multiple fibromyalgia tender points and negative control points, no arthritis, and a generally normal physical examination. (AR 525–26). Dr. Hom recommended daily aerobic physical therapy, reviewing sleep hygiene, cognitive behavioral therapy, and a structured schedule, noting that "[h]aving a job will help with regulating her sleep-wake cycle." (AR 526).

Jenna-Rose then saw Dr. Hom on October 3, 2022. (AR 528–30). There, the fibromyalgia symptoms were reported as severe, occurring constantly, and widespread. (AR 528). Inactivity was an aggravating factor, and no relieving factors were identified. (AR 528). Jenna-Rose reported that her part-time job was tolerable and manageable, but believed it was causing her damage. (AR 528). Dr. Hom identified multiple fibromyalgia tender points and negative control points, along with anxiety, but noted that Jenna-Rose showed good strength and flexibility, and normal physical exam results. (AR 529). Dr. Hom was "[v]ery impressed with

Jenna Rose's adherence to a work schedule," and explained that the patient plan orders included cognitive behavioral therapy, daily aerobic exercise, and having the same bed time. (AR 529). Dr. Hom also encouraged exercise and activity for chronic fatigue. (AR 529).

**2. Dr. Puri's Consultative Exams**

After submitting her application for SSI benefits, Jenna-Rose underwent a consultative exam by Dr. Kautilya Puri on July 15, 2021. (AR 502–04). At that exam, Jenna-Rose explained her history of fibromyalgia and complained of "muscle and joint pains all over her body, especially in her back, arms, and shoulders with tiredness and fatigue when carrying out tasks." (AR 502). She reported taking Motrin as needed. (AR 502). Dr. Puri found that Jenna-Rose's prognosis was "fair." (AR 504). Dr. Puri also found that Jenna-Rose did not have any objective limitations to her communication, fine/gross motor activity, gait, or activities of daily living "on examination today," but recommended that she "not carry out strenuous activity." (AR 504).

Jenna-Rose attended another consultative exam by Dr. Puri on March 24, 2022. (AR 521–24). Dr. Puri wrote that Jenna-Rose appeared to be in no acute distress, with normal gait and stance. (AR 522). Dr. Puri also stated that Jenna-Rose "did not have any objective limitations to communication or fine motor/gross motor activity," nor were there objective limitations to her gait or activities of daily living. (AR 523). Again, Dr. Puri recommended that Jenna-Rose not carry out strenuous activity. (AR 523).

**3. Dr. Murphy's Psychiatric Evaluation**

On March 17, 2022, Dr. Alison Murphy, a psychologist, conducted a consultative psychiatric evaluation of Jenna-Rose. (AR 516–19). Dr. Murphy explained that Jenna-Rose had normal motor behavior and appropriate eye contact. (AR 517). Dr. Murphy then found that Jenna-Rose had a coherent and goal directed thought process, with no evidence of hallucinations, delusions, or paranoia. (AR 517). Next, Dr. Murphy noted that Jenna-Rose's attention and concentration were "[m]oderately impaired due to anxiety and nervousness in the evaluation." (AR 517). Jenna-Rose could count and do serial 3s from 20, but could not do simple calculations or serial 7s from 100. (AR 517). Dr. Murphy also found that Jenna-Rose's memory was intact and that she had average intellectual functioning. (AR 517). Jenna-Rose could also dress, bathe, groom, cook, clean, do laundry, shop, drive herself, and manage money. (AR 518).

Dr. Murphy then evaluated Jenna-Rose's vocational functional capacity. Of the nine functional categories measured, Dr. Murphy found that Jenna-Rose had no evidence of limitation in eight of the categories.[1] (AR 518). The exception was that Dr. Murphy found Jenna-Rose to have a moderate limitation in the category of "[s]ustain[ing] concentration and perform[ing] a task at a consistent pace." (AR

---

[1] Dr. Murphy evaluated whether Jenna-Rose displayed limitations in the following categories: (1) understand, remember, or apply simple directions and instructions; (2) understand, remember, or apply complex directions and instructions; (3) use reason and judgment to make work-related decisions; (4) interact adequately with supervisors, co-workers, and the public; (5) sustain concentration and perform a task at a consistent pace; (6) sustain an ordinary routine and regular attendance at work; (7) regulate emotions, control behavior, and maintain well-being; (8) maintain personal hygiene and appropriate attire; and (9) awareness of normal hazards and taking appropriate precautions. (AR 518).

518). Dr. Murphy stated that "[t]he results of the present evaluation appear to be consistent with cognitive problems, but in itself, [do] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (AR 518).

In addition to the reported medical diagnosis of fibromyalgia, Dr. Murphy diagnosed Jenna-Rose with a "[s]pecific learning disorder," but did not provide further details. (AR 519). She recommended that Jenna-Rose receive vocational training. (AR 519). Dr. Murphy found that Jenna Rose's prognosis was "fair," but that she would "need assistance to manage funds due to the cognitive deficits demonstrated during the evaluation." (AR 519).

**4. State Agency Non-Examining Reviews**

Two state agency medical consultants provided disability determination explanations for Jenna-Rose: first on July 21, 2021 at the initial level (AR 74–85), then on April 25, 2022 at the reconsideration level (AR 88–104).

The July 21, 2021 explanation, completed by Dr. M. Vasquez Gonzalez, opined that Jenna-Rose had a severe medically determinable impairment of fibromyalgia. (AR 78). Dr. Vasquez Gonzalez stated that the fibromyalgia could reasonably be expected to produce Jenna-Rose's pain and fatigue, but that her statements about the intensity, persistence, and functionally limiting effects were not substantiated by the objective medical evidence, and were only partially consistent with the medical opinions on file, which at the time included only Dr. Puri's July 15, 2021 medical opinion. (AR 79–80).

As for Jenna-Rose's residual functional capacity ("RFC") assessment, Dr. Vazquez Gonzalez found that Jenna-Rose had certain exertional and postural limitations, including limitations in lifting/carrying, climbing ramps/stairs, climbing ladders/ropes/scaffolds, stooping, kneeling, crouching, and crawling, but had no manipulative, visual, communicative, or environmental limitations. (AR 80–82). Dr. Vasquez Gonzalez also noted that recent medical exams showed normal gait and balance, a full range of motion of the cervical and lumbar spine, multiple trigger points, and no neurological deficits. (AR 82). The report concluded that Jenna-Rose was "not disabled" based on the documented findings. (AR 84).

Upon reconsideration, Dr. I. Seok completed another disability determination explanation in April 2022. The evidentiary record now contained evidence submitted following the initial determination. (*See* AR 90–94). The explanation included a Psychiatric Review Technique assessment completed by Dr. Y. Sherer. (AR 96). That assessment noted allegations of memory problems, difficulty concentrating, and brain fog associated with fibromyalgia. (AR 96). However, Dr. Sherer found Dr. Murphy's diagnosis of a specific learning disorder to be inconsistent with the reported history of regular education with a high school diploma. (AR 96). The assessment then noted that Jenna-Rose endorsed no other psychiatric symptoms, and that the psychiatric evaluation showed no medically determinable impairment and minimal functioning limitations. (AR 96).

Next, Dr. Seok documented symptoms of pain, fatigue, limitations in understanding and memory, and limitations in sustained concentration and

persistence. (AR 97). Dr. Seok found that one or more of Jenna-Rose's impairments could reasonably be expected to produce her symptoms, but again found that her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence, and only partially consistent with the total medical and non-medical evidence on file. (AR 97). Dr. Seok explained that Jenna-Rose reported to be doing well to her rheumatologist, that there was no evidence of concentration/memory issues, and that her activities of daily living were intact. (AR 97).

On the RFC assessment, Dr. Seok determined that Jenna-Rose had exertional limitations where she could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for four hours, sit for more than six hours on a sustained basis in an eight-hour workday, and push/pull an unlimited amount (except when lifting/carrying). (AR 99). Dr. Seok noted that due to fibromyalgia, Jenna-Rose may experience increased pain and fatigue, but could consistently sustain four hours of standing/walking in an eight-hour workday. (AR 99). As for postural limitations, Dr. Seok found that Jenna-Rose could occasionally climb, frequently kneel, stoop, crouch, and crawl, and found no limitations as to balance. (AR 100). Like the prior disability determination assessment, Dr. Seok determined that Jenna-Rose was not disabled. (AR 104).

**5. First ALJ Decision and Remand**

Following a hearing at which Jenna-Rose and a vocational expert testified (AR 34–73), ALJ McCormack issued his first decision finding Jenna-Rose to be not

disabled on November 22, 2022. (AR 15–25). Broadly speaking, the ALJ's conclusions were the same as in his subsequent ruling now under review: Jenna-Rose's fibromyalgia constitutes a severe impairment and her other claimed conditions, including a learning disorder, are non-severe (AR 18–20); she has the RFC to perform sedentary work, except that she can climb and crawl only on an occasional basis and can stoop and crouch on a frequent basis (AR 20–24); and while she has no past relevant work, there are jobs that exist in the national economy that she can perform, such as office clerk, bench hand, and sorter, which are all unskilled jobs performed at sedentary exertion (AR 24–25).

The Appeals Council's June 12, 2024 order of remand (following remand from this Court) explained that the ALJ had not adequately evaluated whether Jenna-Rose's fibromyalgia, which the ALJ had determined was a severe impairment, equaled the requirements of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (AR 637). The Appeals Council's order further explained that the ALJ's decision did not contain an adequate evaluation of Jenna-Rose's symptoms, noting that the decision did not consider evidence indicating that her symptoms were worsening and did not consider evidence showing a more limited ability to perform daily activities. (AR 637–38).

The Appeal Council thus remanded the case to the ALJ with instructions to "[f]urther consider the nature, severity, and limiting effects of the claimant's fibromyalgia per Social Security Ruling 12-2p," "[f]urther consider the nature, severity, and limiting effects of the claimant's fibromyalgia and whether it

medically equals one of the listed impairments in 20 CFR Part 404," and "[f]urther evaluate the claimant's alleged symptoms and provide rationale in accordance with [applicable] regulations." (AR 638).

**6. Additional Assessments by Dr. Hom**

On remand, Jenna-Rose submitted summaries of additional exams by Dr. Hom and another medical source opinion from Dr. Hom. No other supplemental medical evidence was made part of the record.

Jenna-Rose saw Dr. Hom on April 3, 2023. (AR 770–72). In the physical examination, Dr. Hom found good strength and flexibility, normal physical results, and a "[s]triking improvement in mood and confidence." (AR 771). Dr. Hom wrote that Jenna-Rose's fibromyalgia was ongoing with pain but was improved, with "excellent function, waking, and working." (AR 771). Dr. Hom recommended a less hazardous job than a "pet wrangler," daily exercise, and a consistent bedtime. (AR 771). Dr. Hom found that Jenna-Rose's chronic fatigue had "improved" and that she looked better and was functioning better than she had seen Jenna-Rose in "years." (AR 771).

An October 5, 2023 visit with Dr. Hom showed reported symptoms as being "severe," occurring "constantly," and "widespread," with aggravating factors including inactivity and relieving factors including movement. (AR 773). Dr. Hom noted that Jenna-Rose was working a 6.5-hour shift, which was "suboptimal" and "just under the time needed to require a break[,]" but was otherwise "thriving" at the dog-daycare facility. (AR 773). Again, Dr. Hom documented the physical

examination to be generally normal and wrote that Jenna-Rose showed "[i]mpressive progress." (AR 773–74). Dr. Hom recommended cognitive behavioral therapy, daily exercise, and the same bedtime each night. (AR 774).

The next visit with Dr. Hom took place on April 11, 2024. (AR 775–77). Jenna-Rose reported her symptoms as severe, constant, and widespread. (AR 775). The aggravating factors now included exercise, motion, poor sleep, and stress, but with relieving factors including exercise, sleep hygiene, and maintaining normal activities of daily living. (AR 775). Jenna-Rose showed a generally normal physical examination. (AR 776). Dr. Hom found that Jenna-Rose was "doing very well and improving control over her pain and her lifestyle." (AR 776). Dr. Hom recommended that Jenna-Rose continue to seek out aerobic exercise and monitor her sleep habits. (AR 776).

Dr. Hom then saw Jenna Rose for chronic fatigue on October 10, 2024. (AR 778–79). Dr. Hom noted a "severe" level of fatigue, that the fatigue was "stable," and that Jenna-Rose's symptoms are aggravated by stress, exercise, and work issues. (AR 778). Dr. Hom again noted a generally normal physical examination, found improved fibromyalgia, and that Jenna-Rose was functioning at a "low normal level, which [was] very encouraging." (AR 779). Dr. Hom stated that Jenna-Rose could benefit from a "modest exercise program." (AR 779).

Dr. Hom completed another medical source statement on January 9, 2025, noting that Jenna-Rose's last exam was on October 10, 2024. (AR 757–64). In addition to fibromyalgia, Dr. Hom listed back pain, headache, and mixed irritable

bowel syndrome as other diagnosed impairments. (AR 757). Dr. Hom noted that Jenna-Rose displayed symptoms including multiple tender points, chronic fatigue, nonrestorative sleep, frequent/severe headaches, and anxiety. (AR 758). Dr. Hom described the nature, frequency, and severity of Jenna-Rose's pain as "constant" and noted that Jenna-Rose takes vitamin D. (AR 759).

Dr. Hom again checked "yes" in response to whether Jenna-Rose's symptoms were severe enough to interfere with attention and concentration, and checked "occasionally" (under one-third of an eight-hour workday) when asked about the frequency with which the interferences would occur. (AR 760). Dr. Hom believed that Jenna-Rose would be capable of low or moderate stress jobs, but noted that she displays "worse function with stress." (AR 760–61). Dr. Hom then explained that Jenna-Rose would need to take unscheduled breaks "rarely" during an eight-hour workday, and that such breaks would last around 10 minutes. (AR 762). Lastly, Dr. Hom expected that Jenna-Rose's impairments would likely produce good and bad days about once a month. (AR 764).

**C. January 30, 2025 Hearing**

Jenna-Rose attended a hearing in front of ALJ McCormack on January 30, 2025. (AR 556–94). At the hearing, she testified that she only lasted about a month in her part-time job at a Target warehouse because the work was "too much on her." (AR 564–65). Specifically, Jenna-Rose testified that the "hours of waking up and getting there and what [she] was doing at the job" was "too much" and that this was due to her fibromyalgia. (AR 565).

When asked about her symptoms, Jenna-Rose explained that she experiences "constant pain all over [her] body," and that it is "very rare to have a good day with fibromyalgia" because she wakes up every day with different symptoms across her body, including legs, feet, neck, shoulders, hands, fingers, and hips. (AR 565). She also reported persistent stomach issues, and that sitting in the same spot is "too much" for her, mostly in her back. (AR 565). She then explained that she has "brain fog" that makes her forget what she is saying, and has a sleep pattern that is "not the best." (AR 566). She does not take prescription medication to treat the fibromyalgia because she is "just not big on taking medication," but does take vitamins and over-the-counter medication. (AR 567, 569).

The ALJ then asked Jenna-Rose about her mobility. In response to being asked whether she can stand or walk for 30 minutes at a time, she stated that she could if she had breaks in between. (AR 567). If not, her back "starts to get really tight." (AR 568).

Jenna-Rose further testified that while she can assist with basic upkeep of the home, she usually has family members help with household tasks. (AR 570). She then explained that she drives three times a week (for around 40–50 minutes) to attend trade school, where she is studying to be an ultrasound technician. (AR 571–72). She attends classes from 8 a.m. to 5 p.m. on those days, but has to get up to take breaks while sitting in the classroom. (AR 574–75). Jenna-Rose also clarified that her plan was not to find full-time employment as an ultrasound

technician, but instead to work on a per diem basis and create her own schedule "to be able to give [her] body that break." (AR 576).

ALJ McCormack then heard testimony from the vocational expert, Joseph Atkinson. (AR 583–91). Based on a hypothetical provided by the ALJ, which included limitations on climbing, crawling, stooping, and crouching later incorporated in the ALJ's RFC finding, Atkinson testified that there were sedentary jobs that exist in significant numbers in the national economy that such an individual would be able to perform. (AR 585–86). Specifically, Atkinson identified the occupations of ticket checker, polisher, and table worker. (AR 586).

**D. ALJ Decision**

In his February 5, 2025 decision, the ALJ found that Jenna-Rose had not participated in substantial gainful activity since her application date, and that her fibromyalgia qualified as a severe impairment under 20 CFR 416.920(c). (AR 538). The ALJ then found that Jenna-Rose's fibromyalgia did not medically equal or meet the severity of one of the listed impairments in CFR Part 404, Subpart P, Appendix 1, citing SSR 12-2p and finding that "the objective and subjective findings in the evidence of record regarding the claimant's fibromyalgia do not indicate limitations in functioning of such severity that this impairment could be found to medically equal a listing, when considered both alone and in combination with at least one other medically determinable impairment." (AR 540).

However, the ALJ determined that Jenna-Rose's reported headaches, impetigo, and irritable bowel syndrome were non-severe. (AR 538–39). The ALJ

also found that Jenna-Rose's alleged disability of a learning disorder was non-severe, as it "does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." (AR 539). In making that finding, the ALJ considered each of the four broad functional areas of mental functioning known as the "paragraph B" criteria. (AR 539). In each area, he found that that Jenna-Rose had no limitation in her mental functioning, relying on Dr. Murphy's findings in her March 2022 consultative psychiatric examination, treatment records indicating no "objective findings of cognitive deficit," "minimal subjective allegations," and "intact activities of daily living." (AR 539–40).

Turning to his RFC assessment, the ALJ found (as he had in his prior decision) that Jenna-Rose has the RFC to perform sedentary work as defined by 20 CFR 416.967(a), except that she can climb and crawl on an occasional basis, and can stoop and crouch on a frequent basis. (AR 541).

In considering Plaintiff's subjective reports of her symptoms, the ALJ found that Jenna-Rose's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were "not consistent with the medical evidence and other evidence in the record." (AR 541). The ALJ explained that "physical examinations have been grossly normal without signs of arthritis or myosotis, and normal gait[,] intact reflexes, and good strength and flexibility." (AR 542). The ALJ then described findings from numerous medical examinations and evaluations between 2021 and 2025, both by Dr. Hom and by

consultative examiners, and concluded that "although the claimant has continued treatment for her fibromyalgia, the objective findings, unremarkable clinical examinations, and generally conservative treatment since prior to the application date reflect a capacity for a range of sedentary work." (AR 542–44). The ALJ also explained that "the claimant has reported a reasonable broad range of activities of daily living that do not evince disabling symptoms" such as bathing and dressing herself, feeding herself, doing household chores, driving and shopping for essentials, counting change, and managing her own money, along with activities such as dog walking and acting as a personal assistant for her mother. (AR 544).

The ALJ then went on to evaluate the persuasiveness of the medical opinions in the record. (AR 544–47). He found the opinions of Dr. Puri, the consultative examiner, generally persuasive; the opinion of Dr. Seok, the state agency medical consultant, partially persuasive; and the opinions reflected in Dr. Hom's medical source statements, including Dr. Hom's updated January 2025 statement, unpersuasive. (AR 545–47). The ALJ explained, in particular, that Dr. Puri's opinion that Jenna-Rose could perform at least a range of sedentary work was supported by, and consistent with, her own exam findings "as well as the rest of the clinical findings and objective testing contained in the record, which reflect normal physical exams despite reports of persistent and chronic muscle and joint pain and fatigue." (AR 546).

With respect to Dr. Murphy's consultative psychiatric exam, the ALJ found Dr. Murphy's opinion "generally persuasive" insofar as she found "no evidence of

limitation in functioning," as that opinion was "supported by, and consistent with, her own mental status examination of the claimant as well as the rest of the evidence of record, which show[ed] no abnormal mental status findings or other cognitive deficits." (AR 546). However, the ALJ found Dr. Murphy's opinion that Jenna-Rose has a "moderate limitation in sustaining concentration and performing tasks at a consistent pace" unpersuasive because it was "inconsistent with the consultative examiner's own generally unremarkable mental status exam." (AR 546). The ALJ went on to explain that while the examination did outline "some limitations in attention during the exam, it was specifically noted that this was due to nervousness and anxiety at the examination." (AR 546). The ALJ also found the moderate limitation finding to be inconsistent with "Dr. Murphy's own statements that the claimant's psychiatric problems do not significantly interfere with her ability to function on a daily basis." (AR 546). Lastly, the ALJ noted that the moderate limitation finding was inconsistent with "the lack of objective psychiatric complications in the evidence." (AR 546).

Having reiterated his prior finding that Jenna-Rose had no past relevant work (AR 548), the ALJ then found (as he had previously) that considering her age, education, work experience, and RFC, there are jobs that exist in the national economy that she can perform. (AR 548). Relying on the testimony of the vocational expert, the ALJ found that these jobs include ticket checker, polisher, and table worker, which all are at a sedentary level of exertion. (AR 548). The ALJ

thus concluded that Jenna-Rose has not been under a disability, as defined in the Social Security Act, since she applied for benefits on May 13, 2021. (AR 549).

## LEGAL STANDARDS

### A. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (cleaned up) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to 'substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review.'" *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (alteration omitted) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Conklin v. Kijakazi*, No. 21 Civ. 8486 (JLC), 2023 WL 104829, at *7 (S.D.N.Y. Jan. 5, 2023) (quoting *Brault*, 683 F.3d at 448). However, the application of this

principle "presupposes that the ALJ has not disregarded or misconstrued relevant evidence and has not applied incorrect legal standards." *Rubin v. O'Malley*, 116 F.4th 145, 155 (2d Cir. 2024).

In weighing whether substantial evidence supports the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (citation omitted). Based on this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (citation omitted).

**B. Determination of Disability**

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357–59 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do

his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Social Security Administration has outlined a five-step, sequential evaluation process to determine whether a claimant is disabled." *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (cleaned up). "The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step." *Manzanares v. Comm'r of Soc. Sec.*, No. 22 Civ. 1898 (SN), 2023 WL 4350651, at *4 (S.D.N.Y. July 5, 2023). The Second Circuit has described the five-step process as follows:

> *First*, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner *next* considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the *third* inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the *fourth* inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. *Finally*, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (emphasis added); *see* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

The claimant bears the burden of proof as to steps one through four; the Commissioner bears the burden as to step five. *See Manzanares*, 2023 WL 4350651 at *4 (citing *Selian*, 708 F.3d at 418).

**C. Evaluation of Medical Opinions**

When considering the persuasiveness of medical opinions, ALJs are required to consider the factors of supportability and consistency, and "must articulate how they evaluated the two factors in their consideration of the medical source's opinions." *Uht v. O'Malley*, No. 22 Civ. 2143 (OTW), 2024 WL 1251176, at *6 (S.D.N.Y. Mar. 22, 2024); *see* 20 C.F.R. § 404.1520c. The ALJ must, on a source-level, explain the approach taken with respect to the supportability and consistency factors. *Ayala v. Kijakazi*, 620 F. Supp. 3d 6, 30 (S.D.N.Y. 2022).

Supportability is "an inquiry confined to the medical source's own records that focuses on how well the medical source supported and explained their opinion." *Vellone ex rel Vellone v. Saul*, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R&R adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021). Consistency is "an all-encompassing inquiry focused on how well the opinion is supported, or not supported, by the entire record." *Id.* The more relevant the evidence and explanations are, and the more consistent the opinion is with other evidence, the more persuasive the opinion is. *Ayala*, 620 F. Supp. at 30; *see also* 20 C.F.R. § 404.1520c(c)(1)–(2).

"An ALJ may not simply conclude that an opinion is well supported or consistent with the record; the ALJ must explain how they reached those

conclusions." *Michael J. M. v. Comm'r of Soc. Sec.*, No. 8:23-CV-00683 (BKS/CFH), 2024 WL 4665085, at *5 (N.D.N.Y. Aug. 19, 2024), *R&R adopted*, 2024 WL 4198497 (N.D.N.Y. Sept. 16, 2024); *see also Vellone*, 2021 WL 319354 at *4 ("Eschewing rote analysis and conclusory explanations, the ALJ must discuss [] the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." (citation omitted)). "[A]n ALJ's failure to properly consider and explain the supportability and consistency factors constitute[s] grounds for remand." *Ayala*, 620 F. Supp. 3d at 30.

**D. Evaluation of Claimant's Testimony**

Social Security regulations require a two-step process for evaluating a claimant's subjective statements about the intensity, persistence, and limiting effects of his or her symptoms. First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010).

Where "findings are supported by substantial evidence, 'the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Them v.*

*Colvin*, No. 14 Civ. 7580 (PKC), 2015 WL 10635499, at *9 (S.D.N.Y. Dec. 22, 2015) (quoting *Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984)); *see also Vargas v. Astrue*, No. 10 Civ. 6306 (PKC), 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) ("An ALJ may properly make such a credibility decision if her decision, after reviewing the medical findings and other evidence in the record, is supported by substantial evidence."). "[C]redibility findings of an ALJ are entitled to great deference and are reversible only if they are patently unreasonable." *Torres v. Comm'r of Soc. Sec.*, No. 22 Civ. 03 (MJP), 2024 WL 5090815, at *4 (W.D.N.Y. Dec. 12, 2024) (internal quotation omitted).

"In assessing a claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony." *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citing *Lugo v. Apfel,* 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998)). "A finding that the witness is not credible must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988) (citing *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983)). "Where the ALJ fails sufficiently to explain a finding that the claimant's testimony was not entirely credible, remand is appropriate." *Valet v. Astrue*, No. 10 Civ. 3282 (KAM), 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (citing *Tornatore v. Barnhart*, No. 05 Civ. 6858 (GEL), 2006 WL 3714649, at *6 (S.D.N.Y. Dec. 12, 2006)).

## DISCUSSION

Jenna-Rose presents two issues for review, both of which challenge the ALJ's RFC determination. First, Plaintiff argues that the ALJ failed to support with substantial evidence his evaluation of Dr. Murphy's finding of moderate limitation in concentration and pace. (Pl. Br. at 1, 5). Second, Plaintiff argues that the ALJ failed to support with substantial evidence his evaluation of Plaintiff's subjective reports of symptoms. (*Id.* at 1, 9). The Court addresses each argument below.

### A. The ALJ's Evaluation of Dr. Murphy's Opinion

Plaintiff argues that the ALJ failed to properly engage in the required supportability and consistency analysis when deeming "unpersuasive" Dr. Murphy's finding of "moderate limitation" in sustaining concentration and performing tasks at a consistent pace. (Pl. Br. at 6–9). Plaintiff asserts that, by failing to engage with Dr. Murphy's finding of a specific learning disorder and consider certain of Dr. Murphy's examination results, the ALJ's analysis did not meet the supportability standard and amounted to "second-guessing" Dr. Murphy's evaluation without a "significant basis" for doing so. (*Id.* at 6–7). Plaintiff further argues that the ALJ's reasoning failed to meet the consistency standard because the ALJ "did not cite any specific findings, and . . . only cited to Dr. Murphy's report ('Exhibit 10F') without citing to any other part of the record." (*Id.* at 7).

Jenna-Rose's supportability argument lacks merit. The ALJ found that Dr. Murphy's finding of moderate limitation was "inconsistent with [Murphy's] own generally unremarkable mental status exam of the claimant." (AR 546). The ALJ

explained that Dr. Murphy's mental status examination (along with the other evidence in the record) showed "no abnormal mental status findings or other cognitive deficits." (AR 546). Then, the ALJ went further than merely summarizing his overall impression of Dr. Murphy's exam. Rather, he explained that, although the exam "did note some limitations in attention during the exam," Dr. Murphy specifically stated that this was "due to nervousness and anxiety at the examination" (AR 546), which was an accurate characterization of Dr. Murphy's report. (*See* AR 517: "ATTENTION AND CONCENTRATION: Moderately impaired due to anxiety and nervousness in the evaluation.")). The ALJ also found inconsistency with "Dr. Murphy's own statements that the claimant's psychiatric problems do not significantly interfere with her ability to function on a daily basis." (AR 546; *see* AR 518 (Dr. Murphy's statement that Plaintiff's cognitive problems do "not appear to be significant enough to interfere with [her] ability to function on a daily basis")).

Because the objective medical evidence provided by Dr. Murphy did not, in the ALJ's eyes, support her conclusion, and in fact contradicted it, the ALJ reasonably determined that Dr. Murphy's moderate limitation finding was unpersuasive from a supportability perspective. *See* 20 C.F.R. § 404.1520c(c)(1) (explaining that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be"). The ALJ's analysis is detailed, nuanced, and accurately grounded in Dr. Murphy's report, thus

easily satisfying the supportability standard. *See Cathleen S. v. Comm'r of Soc. Sec.,* No. 6:25-CV-06056-JJM, 2026 WL 2224567, at *7 (W.D.N.Y. Aug. 3, 2026) (noting that "the ALJ must only provide enough explanation to permit a reviewing court to trace the ALJ's reasoning and conduct meaningful judicial review"); *Ramirez v. Comm'r of Soc. Sec.*, No. 24 Civ. 8597 (NCM), 2026 WL 820986, at *8 (E.D.N.Y. Mar. 25, 2026) (finding supportability analysis adequate where ALJ found that doctor's opinion that plaintiff suffered from limitations in "maintaining attention and concentration" was "unsupported by [doctor's] own treatment records," as court could not conclude that the ALJ's determination was "not a 'rational interpretation' of the evidence" (citation omitted)).

Jenna-Rose argues that the ALJ's assessment "does not deal with the fact that Dr. Murphy went on to diagnose a specific learning disorder." (Pl. Br. at 6). But as the Commissioner notes (Gov. Br. at 10), the ALJ had already found, at step two of the analysis, that Jenna-Rose's learning disorder "does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore non-severe." (AR 539). Moreover, immediately after his evaluation of Dr. Murphy's opinion, the ALJ rejected as unpersuasive the opinion of Dr. Sherer, the state agency reviewer, that Jenna-Rose's claimed specific learning disorder was not an impairment at all, "as it is inconsistent with the diagnosis rendered" in Dr. Murphy's report—*i.e.*, that Jenna-Rose did have a specific learning disorder. (AR 546; *see* AR 96). Thus, it is clear that the ALJ's RFC assessment did account for Dr. Murphy's diagnosis. Given that Dr. Murphy's report did not elaborate as to the

nature of the learning disorder or how it might affect Jenna-Rose's ability to concentrate or perform tasks at a consistent pace (*see* AR 519), it was not unreasonable for the ALJ to consider that diagnosis itself as insufficiently supportive of Dr. Murphy's opinion that Jenna-Rose had moderate limitations in these areas.

Jenna-Rose also argues that the ALJ failed to explain "why Dr. Murphy—the Agency's own expert—would find an unnecessary limitation" or provide any "reason to believe that Dr. Murphy was incapable of determining that Plaintiff would struggle to sustain concentration and pace." (Pl. Br. at 6–7). But Plaintiff cites no authority to suggest that an SSA doctor's opinion is entitled to greater weight if favorable to the claimant, or that an ALJ must discuss the doctor's motivations or qualifications. Supportability requires that the ALJ assess the medical source's own records, focusing on how well the source supported and explained their opinion. *See Ayala*, 620 F. Supp. 3d at 30. The ALJ properly conducted that analysis here.

The ALJ's consistency analysis was far more sparse. There is only a single sentence specifically devoted to consistency, and it states only that "the moderate limitation in concentration is inconsistent with the lack of objective psychiatric complications." (AR 546). Considered in isolation, that conclusory statement would not comport with the requirement that the ALJ explain *how* he arrived at his determination that Dr. Murphy's opinion lacks consistency with the other evidence in the record. *See* 20 C.F.R. § 404.1520c(b)(2); *Denise W. v. Comm'r of Soc. Sec.*, No. 5:25-CV-349 (MJK), 2026 WL 970009, at *7 (N.D.N.Y. Apr. 9, 2026) (ALJ conclusion

that medical opinion was inconsistent "with the other aforementioned medical opinions, activities and examination findings" was insufficient consistency analysis).

But "the ALJ's conclusion should not be read in isolation." *Girao v. Kijakazi*, No. 22 Civ. 1419 (JLC), 2023 WL 5312064, at *16 (S.D.N.Y. Aug. 18, 2023); *see also Maria S. v. Comm'r of Soc. Sec.*, No. 21-CV-544 (NAM), 2022 WL 3017373, at *6 (N.D.N.Y. 2022) ("[T]he ALJ's evaluation of consistency should not be read in isolation but rather in the context of the complete decision."). Here, as noted above, the ALJ explained in some detail at step two why he believed the evidence showed no more than mild limitations in any of the "paragraph B" functional areas, including in the area of concentrating, persisting, or maintaining pace. That analysis cited and discussed Dr. Murphy's report, specific treatment records that the ALJ described as lacking any "objective findings of cognitive deficit," including with respect to attention and intellectual functioning, and Jenna-Rose's subjective allegations and activities of daily living. (AR 539–40). Moreover, in finding persuasive Dr. Murphy's opinion that Jenna-Rose had no other limitations in mental functioning, the ALJ specifically referenced "the rest of the evidence of record" showing "no abnormal mental status findings or other cognitive deficits" (AR 546), a clear reference to his earlier discussion.

"[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible post-hoc rationalization, it may affirm where the ALJ's consideration of the relevant factors *can be gleaned from the ALJ's decision as a*

*whole*." *John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS) (TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (emphasis added). Here, while the ALJ could have provided a more fulsome explanation, or at least cross-referenced his step two analysis, it is no mystery what he meant when he wrote that Dr. Murphy's opinion was inconsistent with "the lack of objective psychiatric complications in the record," and the rationale for this finding is readily gleaned from his decision. *See Girao*, 2023 WL 5312064, at *16 (finding legally sufficient ALJ's conclusion that doctor's opinion was "inconsistent with the objective findings, which are unremarkable" where the conclusion "followed a thorough discussion of medical findings in the record and their lack of consistency with statements made by [plaintiff] and his mother"); *Maria S.*, 2022 WL 3017373 at *6 (finding consistency analysis sufficient where ALJ had discussed doctor's exam findings as well as mental status exams performed by other medical sources elsewhere in his decision, such that "the Court can follow the logic of the ALJ's conclusion," even if "the decision could have been clearer"); *see also Ramirez*, 2026 WL 820986, at *8–9 (relying on ALJ's previous discussion of paragraph B criteria in considering adequacy of ALJ's finding that doctor's opinion of plaintiff's limited capacity to maintain attention and concentration was unpersuasive). The ALJ's consistency analysis therefore passes muster when viewed in the context of the decision as a whole.

Moreover, if there was any error in the ALJ's articulation of why Dr. Murphy's opinion was inconsistent with the evidence, it was harmless. *See Denise W.*, 2026 WL 970009 at *7 (articulation error harmless where court could "easily

glean" rationale behind consistency analysis through a review of the record); *Mariah T. v. Comm'r of Soc. Sec.*, # 24-CV-6173-FPG, 2025 WL 918672, at *3 (W.D.N.Y. Mar. 26, 2025) (finding lack of explicit discussion of supportability and consistency factors to be harmless and to not warrant remand where court could "adequately glean the ALJ's rationale" for rejecting doctor's opinion regarding plaintiff's limitations, as ALJ expressly considered the same limitations in evaluating a different medical source and "[i]t can be reasonably inferred that the ALJ rejected the same limitations identified by [the doctor] on the same basis").

In arguing that the ALJ's evaluation of Dr. Murphy's opinion was not harmless error, Plaintiff points to the Appeals Council's order remanding the previous action and suggests that the ALJ's consistency analysis failed to comply with the remand order. (Pl. Br. at 7). But the Appeals Council's remand order relates to issues with the ALJ's consideration of Plaintiff's fibromyalgia at the step three analysis, and his evaluation of Plaintiff's alleged symptoms—not his evaluation of Dr. Murphy's report. (*See* AR 637–38).[2]

As discussed by the Commissioner, there is ample evidence in the record to support the ALJ's rejection of Dr. Murphy's opinion that Jenna-Rose had a moderate limitation in sustaining concentration and performing tasks at a consistent pace. That evidence includes Jenna-Rose's attending school, working several part-time jobs, adherence to work schedules, working approximately 6.5-

[2] The ALJ Decision reflects, and Jenna-Rose does not dispute, that the ALJ appropriately considered SSR 12-2p, as required by the remand order, in determining that Plaintiff's fibromyalgia was not medically equivalent to a listed impairment. (AR 540). The ALJ's treatment of Jenna-Rose's subjective symptoms on remand is discussed below. (*See* Discussion § B, *infra*).

hour shifts without breaks, normal psychiatric evaluations at each physical examination, and Dr. Murphy's own consultative exam findings. (Gov. Br. at 10; *see also, e.g.*, AR 438, 440, 442, 444, 450 ("normal" psychiatric findings)); *see also J'zon M. v. Comm'r of Soc. Sec.*, No. 23-cv-00644, 2024 WL 2889098, at *6 (W.D.N.Y. June 10, 2024) ("An ALJ has the discretion to find a medical opinion unpersuasive where it is contradicted by the source's own findings."); *Sherrill B. v. Comm'r of Soc. Sec.*, No. 5:17-CV-754 (ATB), 2018 WL 4150881, at *9 (N.D.N.Y. Aug. 30, 2018) ("Because the ALJ considered the objective medical evidence, plaintiff's daily activities and the hearing testimony in determining that plaintiff's diagnosed depression and anxiety did not impose any limitations on her RFC, the ALJ's determination was supported by substantial evidence."); *Katherine R. v. Comm'r of Soc. Sec.*, 20-CV-1055, 2021 WL 5596416, at *7 (W.D.N.Y. Nov. 30, 2021) ("Where . . . an ALJ's findings of only mild limitations in mental functioning are supported by substantial evidence in the record, the ALJ is not required to include mental limitations or restrictions in the RFC.").

The Court therefore rejects Plaintiff's argument that the ALJ committed reversible legal error in his evaluation of Dr. Murphy's opinion.

**B. The ALJ's Evaluation of Plaintiff's Subjective Statements**

The Court also finds that the ALJ sufficiently considered the record as a whole when evaluating Plaintiff's subjective reports of her symptoms, and that his evaluation is supported by substantial evidence and not legally erroneous.

As explained above, Jenna-Rose testified at the 2025 ALJ hearing that she experiences "constant pain all over [her] body" due to her fibromyalgia, that back pain prevents her from sitting in the same spot for too long, that she suffers from "brain fog" that frequently causes her to forget what she is saying, and that she has trouble sleeping. (AR 565–66). She also explained in her SSA Function Reports (AR 253–67, 277–307) that her condition affects lifting, squatting, bending, standing, walking, sitting, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and following instructions. (*See* AR 261, 265, 286, 301). The ALJ accounted for these reports and other evidence of Jenna-Rose's limitations to a degree in his RFC assessment (AR 541), but ultimately found that Jenna-Rose's statements "concerning the intensity, persistence, and limiting effects of [her] symptoms are not consistent with the medical evidence and other evidence in the record." (AR 541).

In reaching that conclusion, the ALJ considered specific medical records along with other objective and subjective evidence suggesting that the effects of Jenna-Rose's impairments were less severe than her descriptions of them. The ALJ considered, *inter alia*, Dr. Hom's physical examinations that were "grossly normal," showed "intact reflexes" and "good strength and flexibility"; that Dr. Hom encouraged exercise and activity; that Dr. Hom found in 2023 that Jenna-Rose looked and functioned better "than she had in years"; that during the October 10, 2024 visit, Dr. Hom noted that Jenna-Rose was "much improved"; and that Dr. Hom assessed Jenna-Rose at that time with "improved fibromyalgia and stated that she

was functioning at a low normal level, which [Dr. Hom] stated was very encouraging." (AR 542–44). The ALJ also considered two consultative exams that showed normal gait, full squat, ability to walk on heels or toes, no deficits in range of motion of the spine or extremities, and intact hand and finger dexterity with full grip strength. (AR 542). The ALJ then pointed to Jenna-Rose's testimony reporting "a reasonable broad range of activities of daily living that do not evince disabling symptoms," including the ability to bathe, prepare simple meals, do household chores, and drive and shop for essentials. (AR 544). The ALJ also noted that Jenna-Rose has received "generally conservative treatment" and "has not been prescribed any medications for her symptoms." (AR 542, 544).

"[A]n ALJ's evaluation of a social security claimant's subjective symptoms 'is entitled to substantial deference by a reviewing court.'" *Argenti v. Comm'r of Soc. Sec.*, No. 18 Civ. 9345 (AT) (BCM), 2020 WL 9815182, at *16–17 (S.D.N.Y. Feb. 28, 2020) (quoting *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 645 (S.D.N.Y. 2019)), *R&R adopted sub nom. Argenti v. Saul*, 2020 WL 1503171 (S.D.N.Y. Mar. 30, 2020). Courts have rejected arguments that an ALJ erred in evaluating a plaintiff's reported subjective symptoms from fibromyalgia where, as here, "the ALJ identified specific record-based reasons for his ruling" and "substantial evidence" supported that ruling. *Id.*; *see also Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) ("Nor was the ALJ required to credit [plaintiff's] testimony about the severity of her pain [from fibromyalgia] and the functional limitations it caused."); *McKillip v. Comm'r of Soc. Sec.*, No. 18-CV-854S, 2019 WL 5677595, at *7–8 (W.D.N.Y. Nov.

1, 2019) (finding "no error in the ALJ's evaluation of [p]laintiff's subjective complaints" regarding her fibromyalgia where ALJ found, *inter alia*, that plaintiff "is 'generally independent' in activities of daily living" and that "the record of conservative treatment combined with 'stable physical findings and physical function' failed to substantiate [p]laintiff's allegations of debilitating physical pain"); *Bliss v. Comm'r of Soc. Sec.*, No. 6:07–CV–982, 2010 WL 610703, at *4 (N.D.N.Y. Feb. 16, 2010) (affirming ALJ ruling where "substantial evidence supported the ALJ questioning plaintiff's credibility as to the severity of her pain" and claimed inability to work due to fibromyalgia and depression).

Jenna-Rose argues that the ALJ "did not provide substantial evidence for rejecting in part Plaintiff's subjective reports of symptoms in light of" certain specific matters not discussed in his RFC evaluation—namely, the part-time nature of her work, her assertions that work was "damaging" or "too much" for her, and the evidence that Jenna-Rose receives assistance with "basic activities" and has "limitations on driving and shopping." (Pl. Br. at 11). This argument is unavailing.

First, as noted by the Commissioner, the ALJ was "clearly aware" of the part-time nature of Jenna-Rose's work. (Gov. Br. at 13). He specifically referenced the "part-time" nature of Jenna-Rose's dog daycare job and her job at Target—including that she left Target "because she could not perform [the work] due to her fibromyalgia"—earlier in his decision in finding that she had not previously engaged in substantial gainful activity. (AR 538). The ALJ also considered reports of examinations by Dr. Hom in the RFC assessment, such as the report for the

October 3, 2022 office visit, which states that Jenna-Rose was "working part time, up to three days a week" at the dog daycare and that Jenna-Rose described such work as "causing her damage" but "manageable." (AR 542, 767). The ALJ also cited more recent reports by Dr. Hom in 2024 indicating that Jenna-Rose continued to report severe pain and fatigue, with symptoms aggravated by "work issues," but was nonetheless able to continue functioning at a "low normal level." (AR 543–44). Thus, the ALJ Decision reflects that the ALJ did consider the part-time nature of Jenna-Rose's work and the potentially damaging nature of such work in the RFC analysis. *See Syed A. v. Comm'r of Soc. Sec.*, No. 25 Civ. 2051 (GS), 2026 WL 880399, at *10 (S.D.N.Y. Mar. 31, 2026) (finding that references in ALJ decision to portions of the record upon which plaintiff relied "reflect[ed] that [the ALJ] had considered that evidence").

The transcript of the 2025 ALJ hearing also reflects that the ALJ was paying attention and asking follow-up questions while Jenna-Rose was testifying about her activities of daily living and her limitations. (AR 570–71). The ALJ's decision did not misstate or overstate the record in this regard; he found, consistent with Jenna-Rose's testimony, that she was able to engage in a "reasonable broad range of activities of daily living" and that she "can drive and shop for essentials," not that she never receives help with these activities. (AR 544; *see* AR 570–71 (Jenna-Rose's testimony that "[f]or the most part," she is able to assist with basic home upkeep, that she drives 40–50 minutes three days a week for school, and that "[she] do[es]" go to the store to buy things, even though her mom "usually" shops for her)). "In

calculating the RFC, 'an ALJ is not required to discuss every piece of evidence submitted,' and '[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.'" *Stuckman v. Berryhill*, No. 3:17-CV-1921 (JAM), 2019 WL 101900, at *5 (D. Conn. Jan. 4, 2019) (alteration in original) (quoting *Brault*, 683 F.3d at 448); *see also Prince v. Astrue*, No. 10-CV-100S, 2011 WL 6330072, at *3 (W.D.N.Y. Dec. 19, 2011) (no error in credibility assessment where ALJ "was well aware of the [p]laintiff's work history, having discussed the various positions [p]laintiff held during the hearing"), *aff'd*, 490 F. App'x 399 (2d Cir. 2013).

Jenna-Rose also suggests that, in not specifically referencing these aspects of her testimony, the ALJ did not sufficiently heed the Appeals Council's remand order, which noted that the ALJ previously "did not consider other evidence showing a more limited ability to perform daily activities." (AR 638; *see* Pl. Br. at 11). However, the ALJ Decision does in fact consider Plaintiff's subjective symptoms, including, as outlined above, the issues cited by Plaintiff. The ALJ Decision includes extensive discussion of Plaintiff's reported symptoms in her visits with Dr. Hom that took place in 2023 and 2024, after the ALJ's initial ruling. (AR 543–44). Moreover, while the Appeals Council's remand order expressed concern that the ALJ's 2022 decision "did not consider evidence showing a later worsening of symptoms" (AR 638), Dr. Hom's subsequent evaluations in 2023 and 2024 consistently showed an improvement in Jenna-Rose's condition, as described in the ALJ Decision. (*See* AR 543–44 ("Dr. Hom assessed the claimant with fibromyalgia,

improved" during April 3, 2023 visit; "Dr. Hom assessed the claimant with improved fibromyalgia" during October 5, 2023 visit; Jenna-Rose "was assessed with improved fibromyalgia" during April 11, 2024 visit; "Dr. Hom assessed the claimant with improved fibromyalgia" during October 10, 2024 visit)).

The references to Plaintiff's subjective reports and the thorough discussion of the objective evidence supporting the ALJ's position provide sufficient support to the conclusions regarding Plaintiff's symptoms. The ALJ was not required to discuss every item of evidence in the record. *See Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (finding that ALJ's failure to specifically reference certain work history in the decision "[did] not undermine the credibility assessment, given the substantial evidence supporting the ALJ's determination."); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (where "the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient"); *Morgan v. Comm'r of Soc. Sec.*, No. 21 Civ. 340 (KMK) (JCM), 2022 WL 3044861, at *15 (S.D.N.Y. July 8, 2022) (explaining that the ALJ "is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as the evidence of record permits the court to glean the rationale of an ALJ's decision" (quoting *Morales v. Berryhill*, 484 F. Supp. 3d 130, 151 (S.D.N.Y. 2020)), *R&R adopted sub nom. Morgan v. Kijakazi*, 2022 WL 3044576 (S.D.N.Y. Aug. 2, 2022).

Plaintiff also argues that the ALJ's references to "the lack of objective findings" and "generally conservative treatment" indicate that the ALJ did not "duly consider[] the unique nature of a fibromyalgia diagnosis." (Pl. Br. at 11). In support, Plaintiff cites *Lim v. Colvin*, 243 F. Supp. 3d 307 (E.D.N.Y. 2017), which explains that "a number of district courts have overturned denials of disability claims based on fibromyalgia where the ALJ's determination turned on the lack of 'objective' evidence in the record to support the claimant's subjective complaints of pain." *Id.* at 316–17 (collecting cases). However, *Lim* is distinguishable. In *Lim*, the ALJ found that the plaintiff's allegedly disabling condition of fibromyalgia was not a severe impairment in step two, unlike the decision at issue here (AR 538). *See id.* at 312; *see also Wright v. Comm'r of Soc. Sec.*, No. 21-157, 2021 WL 4452158, at *2 (2d Cir. Sept. 29, 2021) (rejecting argument that ALJ erred by refusing to consider subjective fibromyalgia symptoms where the ALJ "noted both [plaintiff's] symptoms and the clinical findings and credited [plaintiff] by finding that his fibromyalgia was a medically determinable impairment"); *Noelle M. v. Bisignano*, No. 3:24-CV-1196 (RAR), 2025 WL 2731033, at *10 (D. Conn. Sept. 25, 2025) (distinguishing *Lim* because, "[u]nlike the case at bar, the claimant in *Lim* was not found to have a severe impairment of fibromyalgia").

Second, the court in *Lim* found that the ALJ applied the wrong legal standard in evaluating the plaintiff's fibromyalgia by requiring "objective" medical evidence supporting the claimant's subjective complaints of pain. 243 F. Supp. 3d at 315–16. In contrast, the ALJ's evaluation of Jenna Rose's subjective reports did

not rely solely on the lack of objective evidence. The ALJ considered non-objective evidence coming from both Plaintiff's testimony and her subjective reports to medical professionals. (*See* AR 542–44). The ALJ credited Plaintiff's subjective reports in finding that Jenna-Rose's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR 541). Further, in evaluating Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms, it is clear that the ALJ considered Plaintiff's subjective reports. The ALJ wrote throughout the opinion that Plaintiff reported symptoms such as chronic muscle and joint pain, tender points, fatigue, and malaise; that aggravating factors included exercise, motion, poor sleep, and stress; and that those symptoms were reported to be severe, constant and widespread. (*See* AR 542–43). He also considered Plaintiff's testimony regarding her "reasonable broad range of activities of daily living." (AR 544). Indeed, the ALJ even wrote that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record." (AR 541). It "thus appears that the ALJ considered evidence beyond *just* objective medical evidence of record, precisely as the case law and regulations would dictate." *Noelle*, 2025 WL 2731033, at *11 (distinguishing *Lim* on this ground as well (emphasis added)); *see also Marie R. v. Comm'r of Soc. Sec.*, No. 6:21-CV-775 (CFH), 2022 WL 2180989, at *9 (N.D.N.Y. June 14, 2022) (remand not warranted where ALJ "considered

plaintiff's fibromyalgia, the resulting symptoms, and [] medical opinions related thereto from across the relevant time period").

Next, Plaintiff argues in her reply brief that, in relying on the "conservative treatment" of her fibromyalgia to support his evaluation of Plaintiff's subjective reports, the ALJ failed to address the reasons for this conservative treatment, as required by SSR 16-3p. (Reply at 3). Plaintiff did not make this argument or cite SSR 16-3p in his opening brief, which is reason enough to reject the argument. *See Harrison v. Comm'r of Soc. Sec.*, No. 20 Civ. 5282 (BCM), 2022 WL 1289357, at *10 (S.D.N.Y. Apr. 29, 2022) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered." (citation omitted)).

But even considered on its merits, the argument is unavailing. SSR 16-3p explains that the SSA "will consider and address reasons for not pursuing treatment that are pertinent to an individual case," and lists non-exhaustive examples of possible reasons a claimant may not have pursued treatment. SSR 16-3p: Titles II and XVI Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *9–10 (Oct. 25, 2017). Plaintiff contends that, during her testimony, she gave a reason for not taking medication that corresponds to the following example in SSR 16-3p: "An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms." (Reply at 3 (quoting SSR 16-3p, 2017 WL 5180304 at *10)). But Plaintiff's testimony does not resemble this example. Rather, when asked by the ALJ if her doctor had ever

prescribed her medicine for her fibromyalgia, Plaintiff stated: "It's been talked about but I'm just not big on taking medication, so I've never taken anything for it." (AR 567). She did not identify any side effects from the medication or say that they were worse than her pain symptoms; she simply expressed a vague aversion to medication in general. And the ALJ specifically noted in his RFC assessment that Plaintiff "does not use any medication" for her fibromyalgia and other claimed physical impairments. (AR 541). These circumstances do not establish a violation of the ALJ's obligation under SSR 16-3p. *See Kevin Thomas C. v. Comm'r of Soc. Sec.*, No. 5:20-CV-1037 (CFH), 2022 WL 539392, at *12 (N.D.N.Y. Feb. 23, 2022) ("As the ALJ asked plaintiff . . . about his decision to not take medications and accurately noted that plaintiff was not in favor of doing so, the Court finds no error in the ALJ's consideration under SSR 16-3p.").

Even if the ALJ did not properly address Jenna-Rose's reason for not pursuing treatment, the ALJ's overall determination regarding Plaintiff's subjective complaints was supported by substantial evidence and is therefore not reversible error. *See Laura R. v. Comm'r of Soc. Sec.*, No. 5:21-CV-00320 (MAD), 2022 WL 4225223, at *7 (N.D.N.Y. Sept. 12, 2022) (upholding ALJ decision even though ALJ "may have erred or not explicitly referenced a particular factor" in analyzing plaintiff's subjective complaints where "evidence in the record substantiates the ALJ's determination").

The Court recognizes that Jenna-Rose submitted evidence that the ALJ could have interpreted to limit her RFC more than he did. But where the administrative

record "adequately support[s] contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Klemons v. Kijakazi*, 626 F. Supp. 3d 620, 625 (S.D.N.Y. 2022) (quoting *Genier*, 606 F.3d at 49). Here, the ALJ's RFC assessment accounted for Plaintiff's subjective symptoms by limiting her to occasional climbing and crawling and frequent stooping and crouching. (AR 541). His conclusion that Jenna-Rose had the RFC to perform a range of sedentary work, with these limitations, is supported by substantial evidence and thus requires deference. *See Argenti*, 2020 WL 9815182, at *20 ("To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater limitations [due to her fibromyalgia] than those the ALJ incorporated into her RFC determination. But that is not the test. 'If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists.'" (quoting *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008))).

The Court therefore rejects Plaintiff's argument that the ALJ committed legal error in his evaluation of Plaintiff's subjective reports of her symptoms.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is **DENIED** and the Commissioner's determination is **AFFIRMED**.

**SO ORDERED.**

DATED: New York, New York
September 30, 2026

GARY STEIN
United States Magistrate Judge